UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHERRY HILL TOWERS, L.L.C.,       :
                                  :
          Plaintiff,              :      HONORABLE JOSEPH E. IRENAS
                                  :
     v.                           :      CIVIL ACTION NO. 03-4744 (JEI)
                                  :
TOWNSHIP OF CHERRY HILL,          :
CHERRY HILL TOWNSHIP              :           **OPINION**
DEPARTMENT OF CODE               :
ENFORCEMENT, and ANTHONY         :
SACCOMANNO,                       :
                                  :
          Defendants.             :


**APPEARANCES:**

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
By: William J. DeSantis, Esq.
Plaza 1000 - Main Street
Suite 500
Voorhees, New Jersey 08043
     Counsel for Plaintiff

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
By: Richard L. Goldstein, Esq.
Woodland Falls Corporate Park
200 Lake Drive East, Suite 300
Cherry Hill, New Jersey 08002
     Counsel for Defendants


**IRENAS**, Senior District Judge:

     This lawsuit arises from the events surrounding the

application for construction permits by Plaintiff Cherry Hill

Towers, LLC ("Plaintiff" or "Towers"), for the Cherry Hill Towers

reconstruction project.  Defendant Cherry Hill Township

("Township") issued the permits three months after the application

was submitted, but Plaintiff alleges that the delay caused it to

lose over $930,000.

Plaintiff filed the instant Section 1983 complaint against the Defendants Cherry Hill Township, Cherry Hill Township Department of Code Enforcement and Anthony Saccomanno, Director of the Department of Code Enforcement, ("Defendants") on October 6, 2003.  In Count I, Plaintiff alleges that Defendants' delay in issuing construction permits was arbitrary, irrational and tainted by improper motive, in violation of its right to substantive due process under the Fourteenth Amendment.  Plaintiff also contends that the delay violated its procedural due process rights under the Fourteenth Amendment.  In Count II, Plaintiff alleges that Defendants' actions violated its right to equal protection of law under the Fourteenth Amendment.  In Count III, Plaintiff brings a state law claim for tortious interference with contract and prospective economic advantage against Saccomanno.  Presently before the Court is Defendants' Motion for Summary Judgment on all counts of the Complaint.

## II.

Plaintiff entered into a contract for the purchase of two high-rise apartment buildings (the Cherry Hill Towers) in Cherry Hill, New Jersey, in or about September, 1998, with the intent of renovating the dilapidated buildings.  Plaintiff contracted with Viking Associates ("Viking") to manage the renovation project.[1]

---

[1]This memorandum will refer to Towers and Viking collectively as "Plaintiff."

Plaintiff closed on the property in or about December, 2002.  On February 10, 2003, Plaintiff submitted reconstruction plans for to Defendant Cherry Hill Township Department of Code Enforcement (the "Department") for a pre-permit application review, which is a relatively common practice in the Township.

The Department officials responsible for ensuring building code compliance reviewed Plaintiff's submission, and on March 11, 2003, generated a Plan Review Correction List ("the List").  (Def. Br. Ex. D.)  The List identified several areas in which the submitted plans did not meet the code standards, including various requirements under the Electrical, Plumbing, Building and Fire Subcodes.  (Id.)  The Building Code review official included among his concerns that "a number of showers and water closets are not accessible or adaptable," and listed the unit numbers of multiple apartments exhibiting this problem.  (Id. at 2.)  The letter also noted that if the permits for the project were not issued by May 4, 2003, the plans must conform with the 1998, rather than the 1992, version of the International Code Council/American National Standards Institute standard for accessible construction ("ICC/ANSI standard"), as codified in New Jersey by the Barrier Free Subcode.  (Id.)

Plaintiff's architect, Philip Ruggieri, addressed the issues raised by the List in an April 1, 2003, letter to the Department. (Def. Br. Ex. E.)  In response to the concerns about the accessibility and adaptability of the bathrooms, Ruggieri referred

3

to an undated and unspecified prior agreement between Viking and the Department that the units will be built to be adaptable, and will be converted to accessible units by Towers "as required."[2] (Id. at 2.)  The letter also referred to the 1992 version of the ICC/ANSI standard, but did not specifically state that the 1998 version was inapplicable.[3]  (Id.)  The Department did not respond to Ruggieri's letter.

On April 16, 2003, Plaintiff submitted applications for construction permits for the two buildings.  (Def. Br. Exs. F, G.) On or about May 1, 2003, John Kozak, administrative assistant to Saccomanno, called Pam Sconyo of Viking to inform her of the cost of the permits.  Plaintiff maintains that it was the general practice of the Department to inform an applicant of the fee at the time the permits are to be issued, but Defendants contend that Kozak was returning Sconyo's earlier phone message inquiring about the cost.  Sconyo prepared a check and went to the Department office that day in an attempt to pick up the permits, but Kozak told her that the permits could not be issued because they still

---

[2]Accessible facilities are those that contain the features necessary for the dwelling to be used by a person with physical disabilities, such as adequate space for a wheelchair to maneuver through the apartment, and grab bars in the showers and toilets. Adaptable facilities are those that can be easily modified to become accessible, such as having the necessary wall supports so that grab bars may be installed, etc.

[3]It appears that the parties later agreed that the 1992 version was applicable, which contained different and presumably less stringent requirements than the 1998 version.  They dispute, however, when this issue was resolved.

needed Saccomanno's signature.

Various representatives of Plaintiff called the Department during May, 2003, to inquire about the status of the permits and were told that the permits were not yet ready.  On May 27, 2003, Plaintiff contends that Saccomanno called Mike Clark, president of Vikings and Towers, to inform Clark that the permits were ready to be picked up.  On May 28, 2003, Clark, Robert Healey, an owner of Viking and Towers, and project manager Gary Kozianowski met with various union representatives to inform them that Plaintiff intended to use non-union contractors, as the union bids were seven million dollars higher.  Plaintiff alleges that Saccomanno spoke that day with one of the union representatives about the meeting, and then called Clark on May 29, 2003, to tell him not to come in to pick up the permits, stating also that he understood that Plaintiff "blew out" or "blew up" the unions the day before. Defendants deny Saccomanno took part in either conversation, and maintain that the call to the union representative could have been made by another Department official in regard to a project unrelated to Plaintiff.[4]

Despite Saccomanno's warning, Clark went to the Department on May 30, 2003, to submit a check for the construction permits. Kozak gave Clark a letter stating that the permits have been

_____

[4]Plaintiff offers records of a cell phone assigned to Kozak, Saccomanno's assistant, which show a phone call was placed to union representative Dennis Garbowski on May 28, 2003.

denied, referring to a reevaluation of the Barrier Free Code compliance issues.  (Def. Br. Ex. J.)  Later that day, Clark received a phone call from Kozak, asking him to return to the Department.  When Clark returned, he met with Saccomanno, Kozak and the Township counsel.  He received a revised denial letter, which added the provision: "However, if you address the above as outlined, the permits will be released."  (Def. Br. Ex. K.)

In a June 6, 2003, letter to Saccomanno, Clark responded to the permit denial letters.  (Def. Br. Ex. L.)  Clark stated that Plaintiff "fully intend[s] to comply [with the 1992 ICC/ANSI standard] on an 'as needed' basis by adapting units to satisfy the needs of our handicapped residents."  (Id.)

On June 9, 2003, Saccomanno wrote Clark a letter detailing the unresolved Barrier Free Code issues.  (Def. Br. Ex. M.) Saccomanno stated that all showers and water closets must be accessible or adaptable, and that Plaintiff's submitted plans were not acceptable because some units had bathrooms which were not accessible or adaptable.  (Id.)  He specifically noted that some of the bathrooms were too small and did not provide adequate space or clearance for accessible showers to be installed, and that the walls adjacent to some toilets did not include adequate supports for grab bars to be later installed.  (Id.)  The letter also stated that the Department would not issue the permits unless Plaintiff presented it with a release from the Camden County Municipal Utility Authority ("CCMUA"), regarding sewer system

6

connection fees.  (Id.)

Clark, Ruggieri and Saccomanno met on June 13, 2003, to discuss the unresolved issues.  They agreed that in units with two bathrooms, only one bathroom was required to be accessible or adaptable.  (Def. Exs. N, O, P.)  However, subsequent communications reveal that they disagreed on which bathroom in such units must be accessible or adaptable.  In letters on June 16 (Ruggieri Ltr., Def. Ex. P), June 19 (Saccomanno Ltr., Def. Ex. Q), June 27 (Ruggieri Ltr., Def. Ex. R), July 2 (Saccomanno Ltr., Def. Ex. AA), and July 9 (Ruggieri Ltr., Def. Ex. BB), 2003, Saccomanno and Ruggieri disputed whether the Barrier Free Code required the common bathroom to be accessible or adaptable, or if it was permissible to designate the bathroom attached to the main bedroom as accessible or adaptable.  In a letter to Ruggieri dated July 10, 2003, however, Saccomanno conceded that "[u]pon additional research, the use of the main bathroom, accessible only through a bedroom, while not desirable, is by code acceptable." (Def. Br. Ex. DD.)

During this time period Plaintiff also experienced difficulties obtaining a release from CCMUA.  In a May 27, 2003, letter to Clark, Andrew Kricun, Chief Engineer and Deputy Executive Director of CCMUA, stated that the sewer connection fee was $772,866.  (Def. Br. Ex. T.)  The parties dispute whether payment of this fee was a pre-requisite to the issuance of the

construction permits.  (See Saccomanno Ltr. to Pls. Counsel Def.
Br. Ex. W.)  Plaintiff maintains that Saccomanno pressured Kricun
to insist upon payment as a pre-requisite.  However, on June 30,
2003, Herman Engelbert, Executive Director of CCMUA, informed
Saccomanno that CCMUA decided that it would not seek a connection
fee from Plaintiff.[5]  (Def. Br. Ex. S.)

      At some point during the month of June, Plaintiff began
moving construction materials into the interior of the two
buildings.  On or about June 11, 2003, Saccomanno and Kozak
informed Clark that Plaintiff must stop loading the building, as
Saccomanno considered this activity to constitute "construction"
for which the permits had not yet been issued.  Clark temporarily
halted loading of the construction materials, but informed
Saccomanno by facsimile on June 16, 2003, that he was going to
reinstate the deliveries and loading.  (Def. Br. Ex. N.)
Saccomanno issued a "stop work" order on June 17, 2003.  (Def. Br.
Ex. X.)  Sconyo, Clark's assistant, inquired at the Department
office regarding the scope of the order, and contends that she
overheard Saccomanno yelling "when I say stop work, I mean all
work" and "I don't want anyone or anything going on in that
building."  (Pl. Br. Exs. 14, 23.)  In a letter to Plaintiff's
counsel on June 20, 2003, Saccomanno clarified that he believed

_____

      [5]On June 30, 2003, Plaintiff also filed a lawsuit against
CCMUA in the Superior Court of New Jersey, Law Division,
challenging the fee and seeking a waiver.

the loading of material and construction equipment was covered by the order.  (Def. Br. Ex. W.)

On July 1, 2003, Clark asked Saccomanno to release "those construction permits not related to the review of our response to the code compliance issues," specifically partial permits for electrical, plumbing and fire suppression work, as well as the building permits for the garage, exterior wall panels and windows. (Def. Br. Ex. Y.)  Saccomanno denied Clark's request the following day.  (Def. Br. Ex. Z.)  Also on July 2, 2003, Plaintiff appealed the denial of the construction permits and release of partial permits, and the issuance of the "stop work" order to the Camden County Construction Board of Appeals (the "Board of Appeals"), of which Saccomanno was chairman.  (Pl. Ex. 29.)  The appeal was scheduled to be heard on August 6, 2003.  (Id.)  Plaintiff sought expedited review of the appeal, but Saccomanno denied the request to move the hearing to an earlier meeting of the Board of Appeals.

Saccomanno eventually signed the construction permits on July 11, 2003.  Plaintiff was informed that the permits were ready on July 17, 2003, and picked them up the following day.

Plaintiff alleges that Saccomanno intentionally delayed the issuance of the permits in order to pressure Plaintiff into using union contractors.  Plaintiff points to several comments Saccomanno allegedly made warning Plaintiff that it would have problems with the project if it did not use union labor. Plaintiff also asserts that various union representatives

9

pressured Plaintiff and the financing bank to use union labor, and pressured non-union contractors to not bid on the project. Defendants argue that the permits were delayed due to problems with Plaintiff's application.

## II.

Under Federal Rule of Civil Procedure 56(c) a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).  The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact,

"its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## III.

The New Jersey legislature enacted the State Uniform Construction Code Act ("the Act") in part to create adequate minimum standards for new construction and to implement uniform, streamlined construction regulations.  N.J.S.A. § 52:27D-120. Pursuant to the authority granted in the Act, the Commissioner of Community Affairs adopted a State Uniform Construction Code ("the Code"), including such subcodes as a building code, a plumbing code, an electrical code, and a barrier free code to ensure accessibility for people with physical disabilities.  N.J.S.A. § 52:27D-123; *see generally* N.J.A.C. § 5:23-1 *et seq.* Administration and enforcement of the Code are delegated to municipal construction officials.  N.J.S.A. § 52:27D-126(a).

Before construction may begin on any building or structure, the owner, his agent, engineer or architect, must submit a written application for a construction permit to the municipal construction official.  N.J.S.A. § 52:27D-130.  If the application conforms with the Act, the Code and any other applicable laws or ordinances, the municipal construction official must approve the application and issue the permit.  N.J.S.A. § 52:27D-131(a).  The municipal construction official must grant, in whole or in part,

11

or deny the application within twenty business days of the receipt of the application. *Id.*; *see also* N.J.A.C. § 5:23-2.16(a). If the application is denied in whole or in part, the municipal construction official must provide a written statement of the reason for the denial. *Id.* If the municipal construction official fails to act on the application within twenty business days, such inaction is deemed a denial for the purposes of an appeal to the construction board of appeals, unless the applicant has agreed to extend the time for review. *Id.*

In reviewing an application for a permit, the municipal construction official must apply the version of the Code in effect at the time the application was submitted. N.J.A.C. § 5:23-1.6(b). If a subcode revision has become operative within the six months preceding the submission of an application, however, the municipal construction official must review the application based upon the code in force immediately prior to the operative date of the revision. N.J.A.C. § 5:23-1.6(a).

New Jersey's Barrier Free Subcode was promulgated in 1999. N.J.A.C. § 5:23-7.1 *et seq.* At that time, the Commissioner adopted the 1992 ICC/ANSI standard as the accessibility standard for the Barrier Free Subcode. *See* N.J.A.C. § 5:23-7.2. In 2002, the Barrier Free Subcode was amended to incorporate the 1998 ICC/ANSI standard. *Id.* The effective date of the revision was November 4, 2002. *Id.*

**IV.**

## A.  Substantive due process

To prevail on a substantive due process claim arising from a municipal land use decision, a plaintiff must establish that (1) he has a property interest protected by due process, and (2) the government's deprivation of that property interest "shocks the conscience." *Spradlin v. Borough of Danville*, No. 4:CV 02 2237, 2005 WL 3320788 at *8 (M.D. Pa. Dec. 7, 2005); *see also United Artists Theatre Circuit, Inc., v. Twp. of Warrington*, 316 F.3d 392, 399-400 (3d Cir. 2003).  While Plaintiff satisfies the first prong, it cannot demonstrate that Defendants' actions shock the conscience.

As owner of the Cherry Hill Towers property, Plaintiff clearly has a property interest protected by due process. "[O]wnership is a property interest worthy of substantive due process protection." *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 600 (3d Cir. 1995).  The Third Circuit has held that cases involving "zoning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiff[]" implicate the fundamental property interest in the ownership of land.  *Indep. Enters., Inc., v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997)(citing *DeBlasio*, 53 F.3d at 600).

In order to establish that a governmental action shocks the conscience, a plaintiff must allege more than a mere improper

13

motive. *United Artists*, 316 F.3d at 400-401.  In *United Artists*, the Third Circuit noted that the "improper motive" test adopted in *Bello v. Walker*, 840 F.2d 1124 (3d Cir. 1988), could not be reconciled with the Supreme Court's adoption of the shocks the conscience standard in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  *Id.* at 399-400.  The Circuit held that *Bello* and its progeny, which held that a municipal land use decision violated substantive due process if it was made with an improper motive or for any reason unrelated to the merits of the issue, were no longer good law.[6]  *Id.* at 400-01.

While there is no "'calibrated yard stick'" to determine whether challenged actions shock the conscience, the standard

---

[6]The plaintiff in *United Artists* was an owner and operator of movie theaters, and had sought land development approval from Warrington Township to build and operate a movie theater on land already owned by the plaintiff.  A second movie theater company also wanted to operate a theater in the township, which was too small to sustain two theaters.  The township asked both companies to pay $100,000 annual impact fees, which plaintiff refused to do while the second company assented.  The plaintiff alleged that the township intentionally complicated and delayed its decision on plaintiff's development proposal, taking fourteen months to grant preliminary approval to the proposal and another six months to give final approval.  The plaintiff filed its application in January, 1996, and received final approval on September 16, 1997. By contrast, the second company applied for approval in January, 1997, and received final approval on March 18, 1997.  The plaintiff sued the township and the township supervisors, contending that the defendants delayed their decision on its application so that the township would receive the impact fee from the second company.  The Third Circuit reversed the district court's denial of the defendants' motion for summary judgment on qualified immunity grounds, and remanded the matter to the district court for reconsideration under the shocks the conscience standard.

encompasses "'only the most egregious official conduct.'" *Id.* at 399-400 (quoting *Lewis*, 523 U.S. at 846). "What is clear is that this test is designed to avoid converting federal courts into super zoning tribunals." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004).

Several factors counsel against the conclusion that Defendants' actions shock the conscience. First, while Plaintiff incurred extensive costs during the time between the submission of its application and the issuance of the permits, the actual delay is not significant. For the purposes of deciding this motion, the Court accepts Plaintiff's allegation of a sixty-five calendar day delay between the statutory response date and the day Plaintiff received notification the permits were granted.[7] A delay of this length in issuing the permits does not, in any event, shock the conscience. *See Galanopoulas v. Smithgall*, No. Civ.A. 02-8362, 2005 WL 196441 *6 (E.D. Pa. Jan. 26, 2005)("[T]wo months' time to secure a building permit cannot be said to be so extreme as to 'shock the conscience.'").

Plaintiff contends that Defendants delayed the issuance of the permits in order to force Plaintiff to use union labor. The

---

[7]Plaintiff appears to have arrived at this figure by counting the calendar days from the date on which the Township's decision was due (May 14, 2003) until Plaintiff was notified that the permits were actually issued (July 17, 2003). However, it is clear from the record that at least part of this delay is attributable to the existence of genuine issues with Plaintiff's application, such as the dispute regarding the installation of wall supports for grab bars.

underlying assumption of this argument is that Plaintiff was entitled to have its initial application approved.  This Court will not decide whether Defendants incorrectly denied Plaintiff's application in the first instance, as the Court is not a "super zoning tribunal." *Eichenlaub*, 385 F.3d at 285.  Moreover, substantive due process concerns are not implicated when a plaintiff alleges that a government official merely acted with an improper motive or made a decision based upon any reason unrelated to the merits of the application. *See United Artists*, 316 F.3d at 400-01; *Am. Marine Rail NJ, LLC, v. City of Bayonne*, 289 F. Supp. 2d 569, 584 (D.N.J. 2003).

Even if the Court accepts Plaintiff's statement of the facts as true, what happened here does not rise to the level of "the kinds of gross misconduct that have shocked the judicial conscience." *Eichenlaub*, 385 F.3d at 285 (citing cases in which the facts suggested unconstitutional takings, seizures and hostility to constitutionally-protected activities).  Whether union officials unconnected to the Township attempted to persuade, or even threaten, the parties involved in the Cherry Hill Towers project to use union labor is not relevant to the question of whether these Defendants deprived Plaintiff of a property right in a manner that shocks the conscience.  Nor is it surprising that a high-profile project such as this would attract the attention of the unions, or that Township officials would recognize this and point it out to Plaintiff.  Defendants' actions do not reflect the

egregious abuse of power that substantive due process was intended to correct.

Plaintiff received the permits and did not use union labor. Although the Court does not have copies of all of the plans, neither party has suggested that the revised plans eventually approved were the same as the plans originally submitted. The Court cannot fault Defendants for strictly interpreting the requirements of the Barrier Free Subcode, especially given that the failure to construct a multi-family dwelling in accordance with the Barrier Free Subcode is a violation of the New Jersey Law Against Discrimination.  *See* N.J.S.A. § 10:5-12.4.  The fact that Defendants did not follow the letter of the law in handling Plaintiff's application is not an issue of constitutional significance.  *See United Artists*, 316 F.3d at 402.  "'A bad faith violation of state law remains only a violation of state law,'" and does not implicate due process concerns.  *United Artists*, 316 F.3d at 402 (quoting *Chesterfield Development Corp. v. City of Chesterfield*, 963 F.2d 1102, 1105 (8th Cir. 1992)).

The cases cited by Plaintiff do not lend support to its contention that Defendants' actions shocked the conscience.  In *American Marine Rail*, the court concluded that the improper motive alleged by the plaintiff would "if proven, constitute a constitutional violation under the Commerce Clause" and held that "a fact finder could also determine that violation of another constitutional provision, i.e. the Commerce Clause, satisfies the

17

conscience shocking standard for a substantive due process violation." 289 F. Supp. 2d at 584. Here, Plaintiff contends that Defendants acted with the improper motive of forcing Plaintiff to use union labor. Such a motive would not violate any other constitutional provision, and thus *American Marine Rail* is not instructive here. *Cf. Eichenlaub*, 385 F.3d at 285 ("The local officials are not accused of seeking to hamper development in order to interfere with otherwise constitutionally protected activity at the project site or because of some bias against an ethnic group.").

The decision of the District of Massachusetts in *Collier v. Town of Harvard*, No. Civ.A.95-11652-DPW, 1997 WL 33781338 (D. Mass. March 28, 1997), is also distinguishable. In that case, the plaintiffs alleged that the defendants denied their application for the variances and permits required to convert their property from a seasonal to a year-round residence in order to pressure plaintiffs to grant an easement across their land to a neighbor of the plaintiffs who was also a member of the town's planning board. *Id.* at *5-6. There is no allegation or any evidence in the instant matter that Defendants sought to profit personally from the delay in issuing the permits to Plaintiff. Moreover, while the District of Massachusetts referred to a standard analogous to the shocks the conscience standard (requiring conduct that was "truly horrendous" or "egregious"), the language of its analysis reveals that it applied the now-rejected improper motive standard

18

of *Bello*.  *Id.* at *5-6.  The court clearly states that it found only that the defendants were "fueled by improper motivations" and that "plaintiffs have certainly pointed 'to at least some glowing embers' that indicate improper motivation on the part of the defendants."  *Id.* at *6-7.

Plaintiff also cites to *Lonzetta Trucking & Excavating Co. v. Schan*, a non-precedential opinion of the Third Circuit, in which the court upheld the denial the defendant zoning board's motion for summary judgment on the plaintiff's substantive due process claim.  144 Fed. Appx. 206 (3d Cir. 2005).  The plaintiff alleged that the zoning board arbitrarily ordered the closure of the quarry operated by the plaintiff, while the zoning board contended that it acted out of the belief that it could regulate the quarry under municipal ordinances and that the plaintiff was in violation of those ordinances.  *Id.* at 212.  The zoning board ordered the closure despite the issuance of a mining permit to the plaintiff for the quarry by the Pennsylvania Department of Environmental Protection.  *Id.* at 208.  The discussion of the facts is scant, and therefore it is difficult to draw any lessons from the Third Circuit's statement that there were disputed factual issues precluding summary judgment on the matter of whether the actions of the zoning board shocked the conscience.

As such, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's substantive due process claim.

B.  Procedural due process

Plaintiff does not contest that New Jersey provides an adequate process for appealing the denial of construction permits, but argues that Saccomanno blocked its access to these procedures. Plaintiff relies upon the Eastern District of Pennsylvania's decision in *Associates in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633 (E.D. Pa. 2003), for the proposition that a procedural due process claim lies where the government blocks a plaintiff's access to otherwise constitutionally adequate appeal procedures.  The facts of that case are significantly distinguishable from Plaintiff's claim.  The plaintiff in *Associates* never received a hearing on its appeal and was barred from engaging in its business.  270 F. Supp. 2d at 660.  Here, however, Plaintiff's appeal was mooted by the issuance of the permits and Plaintiff was able to proceed with the construction project.

Plaintiff argues that its due process rights were violated when Saccomanno failed to render a decision on its application within twenty days.  However, the applicable sections of the statute and the administrative code state that if no decision has been rendered within twenty days, the applicant may treat such inaction as a denial for the purposes of an appeal.  N.J.S.A. § 52:27D-131(a); N.J.A.C. § 5:23A-2.16(a).  Plaintiff did not file its appeal until July 2, 2003, although it was entitled to do so on May 14, 2003, twenty business days after the application was

20

submitted.

Plaintiff further contends that Saccomanno blocked its access to the appeal process by scheduling the appeal hearing for more than a month after the appeal was filed, even though the Board of Appeals was required to render a decision within ten days. *See* N.J.S.A. § 52:27D-127(b); N.J.A.C. § 5:23A-2.3(a). Plaintiff's appeal was rendered moot by Defendants' issuance of the permits prior to the scheduled date of the hearing. Even assuming such a short delay would amount to a denial of procedural due process, Plaintiff's claim based upon what might have happened if the appeal had gone forward is too speculative. Moreover, the statue and administrative code provide that if the Board of Appeals fails to act within that time period, it shall be deemed a denial of the appeal for the purposes of a complaint, application or appeal to a court of competent jurisdiction. *See* N.J.S.A. § 52:27D-127(b); N.J.A.C. § 5:23A-2.3(c). Defendants' Motion will also be granted on Plaintiff's procedural due process claim.

<u>C.  Equal protection</u>

Plaintiff brings an equal protection claim under the "class of one" theory recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)(per curiam). Such claims require that "the individual plaintiff alleges intentional and disparate treatment compared to others similarly situated and that there is no rational basis for the difference in treatment."

21

*Id.* at 564.  An individual plaintiff can challenge such treatment only if it "is irrational and wholly arbitrary."  *Id.* at 565; *see also Eichenlaub*, 385 F.3d at 286.  The Third Circuit has noted that "we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation."  *Eichenlaub*, 385 F.3d at 287.  Plaintiff's equal protection claim also fails.

Plaintiff contends that Defendants acted in an irrational and wholly arbitrary manner when they required Plaintiff to get a waiver from CCMUA prior to the issuance of the construction permits but did not require CCMUA prior approval for the Langston renovation project in Cherry Hill.  The evidence establishes, however, that the Cherry Hill Towers and Langston projects are not similarly situated.  The Cherry Hill Towers project was connected to the Cherry Hill sewer system, whereas the Langston project fed directly into the CCMUA pipeline[8] and bypassed the Cherry Hill sewage collection system.  The Court thus cannot conclude that it was irrational for the Township to require prior approval from the CCMUA before issuing a construction permit for Cherry Hill Towers and not the Langston project.

---

[8]CCMUA is a county agency.

**V.**

Summary judgment will be granted for Defendants on all of Plaintiff's federal claims.  This Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim, and will dismiss Count III of the Complaint without prejudice to refile in state court, pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).


Date:  01/06/06

s/Joseph E. Irenas
_____
                    JOSEPH E. IRENAS, S.U.S.D.J.